UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v. –

JAMES BOWEN,

                    Defendant.

S1 18 Cr. 205 (NSR)

## THE GOVERNMENT'S SENTENCING MEMORANDUM

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Benjamin A. Gianforti
Michael D. Maimin
Assistant United States Attorneys
    *- Of Counsel -*

# TABLE OF CONTENTS

I.    Preliminary Statement ................................................................................ 1

II.    Background ................................................................................................. 1

    A.    Offense Conduct .............................................................................. 1

        1.    Bowen Brought a Gun to a Party, Got Involved in a Fight and a Shooting, and Hid the Gun ................................. 2

        2.    Bowen's Testimony at Trial ................................................ 6

III.    Discussion .................................................................................................. 7

    A.    Applicable Law ................................................................................ 7

    B.    The Applicable Guidelines Range Is 108 To 120 Months ...................... 8

        1.    Bowen's Offense Level ........................................................ 8

            a.    Bowen Used A Firearm in Connection with the State Felony of Evidence Tampering ..................... 9

            b.    Bowen Obstructed Justice by Lying On The Stand ........ 15

        2.    Bowen's Criminal History ................................................... 19

        3.    Guidelines Sentencing Range ............................................. 19

    C.    The Court Should Impose a Sentence Within the Guidelines Range of 108 to 120 Month' Imprisonment ............................................. 19

        1.    Bowen's Submission Does Not Alter the Calculus ..................... 21

IV.    Conclusion ................................................................................................ 24

## I.   Preliminary Statement

The Government respectfully submits this memorandum in advance of the sentencing of the defendant, James Bowen, currently scheduled for September 24, 2021 at 12:15 p.m.

This Court should sentence Bowen within the Sentencing Guidelines range of 108 to 120 months' imprisonment; such a sentence is appropriate in this case, and would be sufficient but not greater than necessary to reflect the seriousness of Brown's conduct, to promote respect for the law, and to ensure adequate general and specific deterrence.[1]

## II.   Background

### A.   Offense Conduct

In the early morning hours of July 1, 2017, Bowen, a convicted felon,[2] tucked a loaded handgun in his left sock before going to a block party on Coyle Place in Yonkers, New York, and ended up shooting himself and Bornwakim Pilgrim with it that night. After the shooting, Bowen attempted to hide the gun by passing it to his friend and co-defendant, James Gaines. The police soon found the gun—still covered in Bowen's blood—in the apartment where Gaines hid it, along with another gun. As the Court noted in rejecting Bowen's post-trial motions, the Government's case—

---

[1] As discussed below, Bowen's Guidelines range is in fact 108 to 135 months, but the offense of conviction, 18 U.S.C. § 922(g)(1), carries a ten-year statutory maximum. 18 U.S.C. § 924(a)(2).

[2] The parties stipulated to the prior felony conviction and interstate commerce elements of 18 U.S.C. § 922(g)(1). (*See* GX 1 and 2; Tr. 561–64).

which consisted of, among other things, Bowen's own admissions, Pilgrim's statements to law enforcement, video surveillance, DNA and gunshot residue ("GSR") analysis, and Bowen and Pilgrim's medical records—was "more than sufficient" to prove Bowen's guilt beyond a reasonable doubt. *United States v. Bowen*, No. 18 Cr. 00205 (NSR), 2021 WL 4044906, at *4 (S.D.N.Y. Sept. 3, 2021).

## 1. Bowen Brought a Gun to a Party, Got Involved in a Fight and a Shooting, and Hid the Gun

Shortly after the shooting, Gaines called one of his girlfriends[3] to say that he could not see her because he had been involved in a shooting. (Docket Entry 81 at 6). Gaines explained that Bowen[4] had come to Gaines's other girlfriend's apartment and asked for a gun because he was having an argument with somebody (presumably Pilgrim); Gaines agreed to help, gave Bowen one gun, and he and Bowen left the apartment carrying a total of two guns. (*Id.*).[5]

---

[3] As the Court knows, Gaines had at least two girlfriends: the one to whom he spoke about the shooting and the one in whose apartment he attempted to hide the guns.

[4] Gaines did not name Bowen in speaking with his girlfriend—or she did not remember the name—but, from the context, it is clear about whom he is speaking.

[5] As the Court knows, the rest of what Gaines told one of his girlfriends—that he and Bowen were involved in a shooting whereby Bowen shot himself in the foot and also shot another person who was fighting with Bowen, and that Gaines and Bowen returned to Gaines's other girlfriend's apartment and left the two guns inside the apartment (Docket Entry 81 at 7)—were wholly corroborated by the evidence at trial, including the video evidence, and the jury's verdict.

By contrast, the version of events that Gaines gave to the Government is corroborated by nothing. On or about April 13, 2021, Gaines told the Government that he found the two guns that were found in his other girlfriend's apartment in a bag on Coyle Place near where the shooting took place. According to Gaines, he picked up the guns

Bowen and Gaines arrived at the party together around 3:30 am or 3:40 a.m. (Tr. 710; *see also* GX 201A).[6]  Shortly thereafter, apparently boosted by the confidence that a handgun gave him, Bowen got into an argument with Pilgrim. (GX 201A at 10:30–10:58; Tr. 711–12, 734–35). Bowen got in Pilgrim's face and waved a lit cigarette at him. (GX 201A at 10:30–10:58). After a few seconds, Pilgrim went after Bowen with a knife, slashing him badly. (GX 401). Pilgrim pursued Bowen out into the street, onto a parked car, and ultimately into the mouth of an alley between 14 and 18 Coyle Place, where Bowen lost his footing and fell onto his back on the sidewalk, with Pilgrim over him. (GX 201A, 202B, 202C).

Bowen managed to create some distance between himself and Pilgrim by pushing Pilgrim away with his (Bowen's) right leg. In those few precious seconds, Bowen reached frantically for his left sock and pulled the trigger of his gun while it was still in his sock,[7] striking himself in the left ankle and Pilgrim in the abdomen. (GX 202B

---

shortly after the fight with the intention of turning them in to the police for a cash reward. Gaines also said that he did not see Bowen with a gun that night. Of course, when Gaines actually encountered the police that night, he said nothing about the two loaded guns, like where to find them in the apartment. Instead, the police had to search the room where Gaines was staying to find the guns. Gaines also noted that he was drunk that night and the whole thing was a blur. Indeed, Gaines can be seen holding what appears to be an alcoholic beverage in the surveillance footage of Bowen and Pilgrim struggling in the mouth of the alley. (*See* GX 202B at 8:43–8:59; Tr. 738). Rather than suborn perjury, the Government opted not to call Gaines at trial.

[6] References to video timestamps are to the media player's timestamp, not the timestamp on the video footage itself.

[7] The forensic evidence showed that Bowen did not even get to pull the gun out of his sock before firing it, burning his skin where the barrel touched his ankle and leaving

at 8:43–8:59, 401 at 25, 402 at 25; Tr. 740–43). Indeed, as Bowen pulled the trigger, a group of bystanders near the opening of the alley scattered down the sidewalk in the opposite direction; Pilgrim's associates who were near the scrum jumped back, startled; and Pilgrim threw himself on top of Bowen. (GX 201B at 11:09–11:27, 202B at 8:43–8:59; Tr. 748). When Pilgrim was pulled off of Bowen a few seconds later, the bullet hole was visible in his shirt. (GX 110, 202B at 8:43–8:59, 361–63, 402 at 25; Tr. 476-80). Having just been shot, Pilgrim ran off.

With Pilgrim now off of him, Bowen dashed into the street, grabbed his gun again, and stood up, aiming the gun in the direction that Pilgrim ran westbound on Coyle Place. (GX 202B at 8:43–8:59, 202C at 8:57–9:18).

Bowen chased after Pilgrim, still clenching the gun in his right hand. After running by 14 Coyle Place, Bowen turned around and began walking back to 26 Rollins Street with the gun still in his right hand. (GX 202D at 9:04–9:31). Despite the fact that he was bleeding profusely, Bowen walked from 14 Coyle Place to 26 Rollins Street— which took approximately two-to-three minutes—leaving a trail of blood. (GX 501; Tr. 758; DX L, M, N, O, P, Q, R, S, T, U, V, X; Tr. 474, 488-500).

The reason Bowen walked this far, and this long, despite losing large quantities of blood, was simple: hiding the gun was more important to him than getting medical attention. When Bowen walked through the front door of 26 Rollins Street, he was

---

his blood and GSR in his sock. (GX 106, 401 at 25; Tr. 370–72, 420–21, 427, 431–34, 439–43).

still holding the gun in his right hand. Seconds afterward, Gaines came into the lobby of 26 Rollins Street and took the gun from Bowen. (GX 203A at 5:21–5:33). Gaines then ran up two flights of stairs to the third floor, holding his shorts up with his right hand so the gun would not fall out. When Gaines reached the third floor, he disappeared into Apartment 3E for approximately 30 seconds, more than enough time to hide a gun. Bowen, bleeding profusely, but apparently more concerned about concealing his crime than anything else, also trudged up and down the two full flights of stairs and waited outside Apartment 3E for Gaines to reemerge. (GX 203B at 1:30–1:57, 203C at 0:55–1:31). Bowen and Gaines then went back downstairs, where they were soon met by members of the Yonkers Police Department and paramedics. (GX 203A; Tr. 543–44, 649–51). At no point did Bowen call 911. (Tr. 761). Nor, needless to say, did he or Gaines tell the police about the guns they just hid; their concern was ensuring that Bowen was not arrested for possessing a gun.

The guns that Gaines hid on behalf of himself and Bowen were not found until after daybreak, when the police found two handguns in Apartment 3E: (1) a loaded, black Taurus .38-caliber revolver (GX 101) with Bowen's blood on it (Tr. 364–69) and an obliterated serial number (PSR ¶ 11; GX 2); and (2) a loaded, silver Cobra .380-caliber semiautomatic pistol (GX 111). (Tr. 616–18, 621–22).

A little under two months later, on his way to court after his arrest, Bowen told the Federal Bureau of Investigation that he "snatched the gun, and it went off," and that he had given the gun to someone to give to the police. (Tr. 774).

### 2.    Bowen's Testimony at Trial

As the Court knows, Bowen chose to testify at trial. As discussed in more detail below, Bowen denied almost all of the evidence: he claimed that he did not bring a gun to the party (only his phone, in his pocket), that he never possessed a gun at all, that he "grabbed at" a gun that was near him (even though, on video, there was no person or gun near him at the time) which went off, and that he only walked all the way to Gaines's girlfriend's building—and up two flights of stairs—while bleeding out so that Gaines could get him a towel, and not to hide the guns. In the midst of the implausible testimony—which was not only contradicted by hard evidence, but also necessarily rejected by the jury because, if true, Bowen would not have been guilty— Bowen offered a chilling summary of his mindset and how he felt that guns did, in fact, protect him:

> A.    I was angry. If I had a gun though, like—like this stuff would have never happened to me. Yes. I am under oath.
>
> Q.    So if you had had a gun, you wouldn't have gotten stabbed?
>
> A.    This would have never happened to me. It would have never escalated the way it did.
>
> Q.    Yeah, you would have shot him, right?
>
> A.    No. I am not going to say that. No. I'm just saying it would never happen, though. It would have never happened.

(Tr. 755). Bowen's testimony also failed to answer the obvious questions, and even more obvious answers, that drove a common-sense verdict:

- *Why did Bowen provoke a fight with Pilgrim*? Because he was feeling confident because of the gun in his sock, not the phone in his pocket. He even admitted that's how he would have felt if he had been carrying a gun (which he was).

- *Why did Bowen frantically reach for his left sock, rather than his pocket, when he got a few precious seconds of respite from Pilgrim's assault*? Because he had his gun in his sock.

- *Why did Bowen frantically reach for his left sock again, rather than his pocket, when he ran out into the street after freeing himself from Pilgrim*? Because he thought that was where his gun still was.

- *Why did Pilgrim run away from Bowen*? Because he did not want to get shot again, not because he was afraid of Bowen's phone.

- *Why did Bowen raise his right arm, with the dark object in his right hand, in the direction Pilgrim ran off*? Because he was aiming his gun at Pilgrim to encourage Pilgrim to keep running.

- *Why did Bowen chase after Pilgrim, the man who had nearly just stabbed him to death*? Because he had a gun and was not afraid of Pilgrim's knife anymore.

- *Why did Bowen walk all the way back to 26 Rollins Street and up and down two full flights of stairs bleeding heavily*? Because he had to make sure he got rid of the gun, not his phone.

- *Why did Bowen not call 911 right away despite being badly injured*? Because he had to make sure he hid the gun before law enforcement arrived.

## III.    Discussion

### A.    Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S.

7

Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal con-duct and promote respect for the law. *Id.* at 50 & n.6.

### B. The Applicable Guidelines Range Is 108 To 120 Months

Bowen's offense level—based on (1) his possession of a firearm; (2) his criminal history; (3) the fact that the gun had an obliterated serial number; (4) his decision to hide the gun after the shooting; and (5) his decision to testify falsely before this Court—is 30, which means that, in Criminal History Category II, his advisory Guidelines range is 108 to 120 months' imprisonment.

### 1. Bowen's Offense Level

The Guideline applicable to a violation of 18 U.S.C. § 922(g)(1) is U.S.S.G. § 2K2.1. Pursuant to U.S.S.G. § 2K2.1(a)(4)(A), because Bowen was previously convicted of assault in the second degree, in violation of N.Y. PENAL LAW § 120.05(2) (PSR ¶ 38), which qualifies as a crime of violence pursuant to U.S.S.G. § 4B1.2(a)(1), *see United States v. Tabb*, 949 F.3d 81, 84–85 (2d Cir. 2020) (holding that assault in the second degree, in violation of N.Y. PENAL LAW § 120.05(2), is categorically a crime of violence under U.S.S.G. § 4B1.2(a)(1)), his base offense level is 20.

Because the .38-caliber revolver that Bowen brought to the party, hidden in his sock, and with which he shot himself and Pilgrim, had an obliterated serial number

(PSR ¶ 11; *see also* GX 2, 101), four offense levels are added pursuant to U.S.S.G. § 2K2.1(b)(4)(A).

That leaves Bowen with an offense level of 24. However, there are two more applicable enhancements that bring his offense level to 30: (1) a four-level enhancement, pursuant to U.S.S.G. § 2K2.1(b)(6)(B) because Bowen used and possessed the handgun in connection with another felony offense, namely Bowen and Gaines's tampering with physical evidence; and (2) a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, because of Bowen's decision to testify falsely at trial. Because Bowen opposes each of these enhancements—indeed, his sentencing letter asserts that he is not guilty of any offense at all—each deserves a more in-depth discussion.

### a.    Bowen Used A Firearm in Connection with the State Felony of Evidence Tampering[8]

U.S.S.G. § 2K2.1(b)(6)(B) provides that a four-point enhancement is appropriate where the defendant "used or possessed any firearm or ammunition in connection

---

[8] The Probation Office asserts that Bowen possessed and used the firearm in connection with a different felony: "assault." (PSR ¶ 23). While the Probation Office's analysis is understandable—Bowen did shoot Pilgrim—it is ultimately both incorrect and, in light of his possession of the firearm in connection with the evidence tampering, unnecessary. First, the Probation Office fails to cite a statute creating the felony in connection with which it asserts Bowen possessed the firearm. Presumably, the Probation Office is thinking of assault in the second degree, in violation of N.Y. Penal Law § 120.05(2), as third-degree assault is a misdemeanor. However, the Government did not elicit proof of Bowen's intent at the time he pulled his trigger, which is key, as the statute requires "intent to cause physical injury." Moreover, while Bowen may have put himself in the situation that resulted in the shooting and stabbing—he

9

with another felony offense." Under New York State law, "[a] person is guilty of tampering with physical evidence"—a Class E Felony—"when … [b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he suppresses it by any act of concealment." N.Y. PENAL LAW § 215.40(2). By tampering with physical evidence—giving the gun to Gaines so that Gaines could hide both the guns that Bowen and Gaines brought to the party—Bowen possessed the firearm in connection with the evidence-tampering felony offense. *See United States v. Sweat*, 688 F. App'x 352, 355–56 (6th Cir. 2017) (holding, where the defendant was convicted of violating Section 922(g)(1) for possessing a gun that he used to shoot back when he was shot at, but which gun he then threw in a trash can before the police arrived, that the Section 2K2.1(b)(6)(B) enhancement applied because he possessed the gun in connection with a violation of Kentucky's evidence tampering statute, K.R.S. § 524.100(1)); *United States v. Marrufo*, 661 F.3d 1204, 1209 (10th Cir. 2011) (holding that defendant who tampered with the firearm he possessed as part of his violation of Section 922(g)(1) merited the Section 2K2.1(b)(6)(B) enhancement because he possessed the gun in connection with a violation of New Mexico's evidence tampering

---

brought a gun to the party specifically because he was having an argument with Pilgrim, and then boldly began to get in Pilgrim's face—at the moment he shot his gun, he was acting in self-defense. In light of this, even if N.Y. PENAL LAW § 120.05(2) did apply—and it is not clear that it would at all—the Government would not urge this Court to apply the Section 2K2.1(b)(6)(B) "in connection with another felony offense" enhancement based on such an assault.

statute, N.M. Stat. § 30-22-5)[9]; *cf. United States v. Hester*, 910 F.3d 78, 89 (3d Cir. 2018) (finding that Section 2K2.1(b)(6)(B) enhancement was not appropriate under New Jersey's evidence tampering statute but only because the government had not established that the defendant had "effectuated the loss or destruction of the weapon," which was required under New Jersey Supreme Court precedent).

Here, Bowen brought a gun to the block party and then, when he attempted to conceal that firearm by handing it off to Gaines at 26 Rollins Street to hide in the apartment, he possessed it in connection with that evidence-tampering offense. N.Y. PENAL LAW § 215.40(2) is plainly applicable, as is the four-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). *See Sweat*, 688 F. App'x at 355–56; *Marrufo*, 661 F.3d at 1209.

Bowen challenges the four-point enhancement not on the substance, but because the Government did not assert this enhancement in its *Pimentel* letter dated July 27, 2020. (Docket Entry 125 at 3–4). In doing so, Bowen misstates the law about non-binding *Pimentel* letters; indeed, his error can be summarized: the law is clear that the Government is not bound by rejected plea agreements or accepted non-binding

---

[9] The Tenth Circuit quickly rejected the defendant's argument that tampering with the firearm at issue was somehow not a felony offense in connection with which he possessed the gun: "Mr. Marrufo's possession of the Hi-Point pistol was no accident or coincidence. Instead, his possession of the firearm was integral to his tampering with evidence. Indeed, Mr. Marrufo's possession of the firearm was the reason he tampered with it. Accordingly, possessing the firearm facilitated tampering with the firearm." *Marrufo*, 661 F.3d at 1208.

*Pimentel* letters, and the Court is not bound by any plea agreements or *Pimentel* letters, so it defies logic that the Government and the Court would be bound by a rejected non-binding *Pimentel* letter.

First, on its face, the *Pimentel* letter explains:

> … *Nothing in this letter limits the right of this Office (1) to change its position at any time as to the appropriate Guidelines calculation in this case, even if that change is based, in whole or in part, on information that was in the Government's possession as of the date of this letter*; and/or (2) to present to the Court or the United States Probation Office, either orally or in writing, any and all facts and arguments relevant to sentencing that are available to the Office at the time of sentencing. …

> *This letter does not and cannot bind either the Court or the United States Probation Office*, either as to questions of fact or *as to determinations of the correct application of the Guidelines in this case*. Instead, the sentence to be imposed upon the defendant will be determined solely by the Court. This Office cannot and does not make any promise or representation as to what sentence the defendant will receive.

(Docket Entry 125, Ex. 1) (emphasis added). In other words, the *Pimentel* letter, on its face, disclaims any reliance on it, explaining that the Government may "change its position at any time as to the appropriate Guidelines calculation in this case, even if that change was based, in whole, or in part, on information that was in the Government's possession as of the date of this letter."

Second, the very concept of the *Pimentel* letter—by the terms set forth by the Second Circuit—was to minimize the chance that defendants who *pleaded guilty* would be surprised, especially against the background of the (sometimes mistaken) belief that the prosecutors could be engaging in sentence-bargaining in return for guilty

pleas. *United States v. Pimentel*, 932 F.2d 1029, 1033–34 (2d Cir. 1991).[10] Here, Bowen rejected the possibility of a plea: he was sent a *Pimentel* letter in July 2020, and went to trial nearly a year later.

Third, there is a distinction between an accepted plea agreement and a non-binding *Pimentel* letter. Specifically, as a general matter, a plea agreement to which the defendant pleads guilty is a binding contract between the defendant and the Government, and the Government may not breach that agreement. *See United States v. Wilson*, 920 F.3d 155 (2d Cir. 2019); *United States v. Palladino*, 347 F.3d 29 (2d Cir. 2003).[11] By contrast, a non-binding *Pimentel* letter does not bind the Government. *Cf. United States v. Habbas*, 527 F.3d 266, 271 (2d Cir. 2008) (holding that Government did not breach plea agreement when, "under the pressures of preparing a *Pimentel* estimate after the defendant indicated readiness to plead, the government simply

---

[10] Indeed, *Pimentel* was issued at a time that sentence bargaining loomed large, as the recently enacted Sentencing Guidelines bound the sentencing court at the time, a background fact that is no longer true.

[11] Bowen cites these cases without noting that they involve defendants who pleaded guilty pursuant to plea agreements, and not defendants who refused to plead guilty pursuant to a non-binding *Pimentel* letter. (Docket Entry 125 at 4). He also cites *United States v. Allen*, 550 F. Supp. 2d 494 (S.D.N.Y. 2008)—citing it only by its Westlaw citation, 2008 WL 1944549 (Docket Entry 125 at 4)—without noting not only that it involved a plea, but also that Judge Scheindlin *withdrew* that opinion, and replaced it with an opinion in which she specifically concluded that "[t]o hold that the *Pimentel* Letters were nonetheless binding on the Government would contradict the plain language of the letters and bestow an undeserved benefit upon defendants, not to mention provide the Government with a motive not to issue *Pimentel* letters in the future." *United States v. Allen*, 644 F. Supp. 2d 422, 437 (S.D.N.Y. 2009). In other words, Bowen relies upon non-binding bad law in support of his attempt to force the Court's hand with a non-binding, rejected letter.

failed to notice the possible applicability" of an aggravating role enhancement).[12] Or, as put simply by the Second Circuit: "In the specific context of an alleged breached *Pimentel* estimate—because a *Pimentel* estimate is no more than that, an estimate— the Government does not violate a defendant's reasonable expectations simply because it deviates from the estimate." *United States v. Wilson*, 920 F.3d 155, 163 (2d Cir. 2019).

Fourth, as a practical matter, Bowen's claim that he "relied on the government's assessment of the guidelines knowing if he were to be found guilty that was his exposure under the guidelines" (Docket Entry 125 at 4) is disinguous at best. It is unclear what reliance there was. Bowen went to trial, rather than pleading guilty pursuant to the *Pimentel* letter. If he is arguing that, had he only known his true exposure, he would have pleaded guilty (to a non-binding letter), that assertion could be quickly dispelled by the facts that: (1) by going to trial, and testifying falsely, Bowen altered the underlying Guidelines estimate because he would no longer receive ac-

---

[12] Notably, in *Habbas*, there was a plea agreement, and not a non-binding *Pimentel* letter, but the plea agreement—to which the defendant pleaded guilty—"clearly stated that the range set forth was merely a non-binding estimate, and warned in several different ways that the government was likely to advocate for a higher sentence." 527 F.3d at 270. Here, of course, there was neither a plea agreement nor, for that matter, a plea.

14

ceptance-of-responsibility credit and he merited an obstruction-of-justice enhancement[13]; (2) Bowen chose to lie at trial, not in reliance on an estimate, but in the belief that he could persuade a jury to acquit him; and (3) to this very day, Bowen continues to press his position—rejected by the jury—that he did not possess a firearm and committed no crime (Docket Entry 125 at 2–3), which means he would not have pleaded guilty in any event.

### b.    Bowen Obstructed Justice by Lying On The Stand

Bowen decided to take the stand and lie to the jury and this Court, committing perjury in an attempt to deny his own criminal liability. As such, he attempted to obstruct justice, and merits a two-level enhancement. "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense," the offense level is increased by two levels. U.S.S.G. § 3C1.1. Conduct covered under this section includes "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge." U.S.S.G. § 3C1.1, comment. (n.4(B) & (F)).

---

[13] Indeed, taken to its logical conclusion, Bowen's argument would mean that this Court would have to grant him acceptance-of-responsibility credit and refuse to assign an obstruction enhancement because those were not contained in the non-binding *Pimentel* letter.

15

With respect to perjury, the obstruction of justice enhancement applies when a defendant testifying under oath "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *accord United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). An obstruction enhancement based on perjury must be supported by a finding that "the defendant's statements unambiguously demonstrate an intent to obstruct." *United States v. Kelly*, 147 F.3d 172, 178-79 (2d Cir. 1998); *see also United States v. Salim*, 549 F.3d 67, 74–75 (2d Cir. 2008) (noting that such findings may be made by a preponderance of the evidence).

When a sentencing court imposes an obstruction enhancement, separate findings of fact are not required, as long as the sentencing court makes "a general finding of obstruction that tracks those factual predicates necessary to support a finding of perjury." *United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993). A court, however, is not required to render its obstruction of justice findings using any particular language or "magic words." *United States v. Dundon*, 349 F. App'x 588, 590–91 (2d Cir. 2009) ("Although the District Court did not use the words 'willfull, willfully,' or 'willfullness' at the sentencing hearing, we do not read our precedent to require the use of magic words at sentencing."); *see United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (*en banc*) ("Sentencing is a responsibility heavy enough without our adding formulaic or ritualized burdens.").

16

Finally, though it may be obvious, if a defendant testifies in a manner that is inconsistent with the jury verdict, and the inconsistencies cannot be attributed to innocent failures of memory or confusion, the Court *must* impose an obstruction enhancement. This is because "'[a] guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.'" *United States v. Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995) (quoting *United States v. Weston*, 960 F.2d 212, 218 (1st Cir. 1992)).

There can be little question that Bowen committed perjury. First, Bowen repeatedly lied about not possessing a gun at any point on or about July 1, 2017. (Tr. 708–10, 715, 720–32, 744–47, 757–58, 761). This was in spite of the "more than sufficient" evidence pointing the other way. *Bowen*, 2021 WL 4044906, at *4. Bowen even denied that he reached for his left ankle during the fight with Pilgrim (Tr. 743–50, 754), even though he can clearly be seen doing just that at two different points in the video surveillance footage: first when he was on his back on the sidewalk after he kicked Pilgrim away from him and then again out in the street after he managed to free himself. (GX 202B at 8:43–8:59, 202C at 8:57–9:18).

Instead, Bowen maintained (and continues to maintain) that, in the heat of the fight with Pilgrim, he "grabbed" at—but never possessed—a gun that "shot off"[14] and that the dark object he picked up off the ground was, in fact, his phone. (Tr. 713, 720–25, 729–31, 741, 743–44, 746, 758–59). Bowen again ignores what the video clearly

---

[14] Note Bowen's glaring use of the passive voice.

shows. The only grabbing motion that Bowen made when he was on his back on the sidewalk—which is when he admitted the gun went off (Tr. 727)—was a grabbing motion towards his left ankle. (GX 202B at 8:43–8:59). Bowen also disregards that, in the moment when the gun went off—the moment when Pilgrim threw himself frantically onto Bowen, Pilgrim's friends jumped back startled, and the bystanders scattered down the sidewalk (GX 201B at 11:09–11:27, 202B at 8:43–8:59; Tr. 727, 748)— no one other than Pilgrim was close enough to Bowen to have held out a gun for Bowen to grab, and Pilgrim had a knife, not a gun. (GX 202B at 8:43–8:59; Tr. 729, 736). Bowen also repeatedly lied under oath about the dark object visible in his right hand being his phone when it was clearly his gun.

Second, Bowen miraculously remembered a critical fact—namely, that he was wearing his left sock inside-out that night. (Tr. 728). This is because the forensic evidence was damning, and wearing the sock inside-out might blunt some of that evidence.[15] In other words, Bowen asked the jury to believe that, nearly four years after suffering a traumatic attack—an attack that was at times was quite hazy in the retelling—he recalled which way he was wearing the sock that somehow undermined overwhelming forensic evidence.

Third, more generally, Bowen's testimony was inconsistent with the verdict. If Bowen were telling the truth—if he never possessed a firearm that night—he was not

---

[15] Of course, the evidence included a diagram showing that the bullet holes in the sock only matched Bowen's injuries if the sock was worn right-side out. (GX 106C). These types of facts did not deter Bowen from proffering false, self-serving testimony.

18

guilty. This, alone, mandates the obstruction enhancement. *See Hourihan*, 66 F.3d at 465.

Bowen explains away none of this in his sentencing submissions. (*See* Docket Entries 125, 126). Rather, he feebly objects to paragraph 17 of the PSR in a single sentence: "Bowen did not testify falsely at trial." (Docket Entry 126 at 2).

Ultimately, what Bowen misses is that, if the jury had believed he was telling the truth, he would have been acquitted. They saw his testimony for what it was: a last ditch series of lies in the face of the overwhelming evidence of his guilt. In short, Bowen repeatedly attempted to obstruct justice, and therefore merits a two-point enhancement, pursuant to U.S.S.G. § 3C1.1.

### 2.    Bowen's Criminal History

Bowen has three criminal history points, and is therefore in Criminal History Category II. (PSR ¶ 40).

### 3.    Guidelines Sentencing Range

At offense level 30 and Criminal History Category II, the initial Guidelines sentencing range is 108 to 135 months' imprisonment. However, the maximum term of imprisonment that this Court may impose is 120 months' imprisonment, *see* 18 U.S.C. § 924(a)(2); accordingly, the Guidelines sentencing range is 108 to 120 months' imprisonment. *See* U.S.S.G. § 5G1.1(c)(1).

### C.    The Court Should Impose a Sentence Within the Guidelines Range of 108 to 120 Month' Imprisonment

A sentence within the applicable Guidelines range of 108 to 120 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate

purposes of sentencing. In particular, the nature and circumstances of the offense, the need to promote respect for the law, and the need to assure both general and specific deterrence, all justify such a sentence.

The nature of Bowen's offense is serious. He went to the block party with a gun that he borrowed from Gaines tucked in his sock because he was having a dispute with Pilgrim. Bowen knew there was a real possibility that he would need the gun. He was right.

Ultimately, no one but Bowen bears responsibility for his crime. He knew he was a convicted felon who could not possess a gun. (GX 1, Tr. 761). Yet he committed his crime—before he even arrived at the block party. He committed his crime while he walked around the block party. He committed his crime while he confronted Pilgrim. He committed his crime when, bleeding profusely, he decided it was more important to walk to Rollins Street than to call for help. He committed his crime when he handed his gun to Gaines to hide for him. The felon-in-possession statute was enacted in part to prevent exactly this situation: someone with a violent felony conviction arming himself and throwing himself into a potentially explosive situation. What happened to Bowen was extremely unfortunate, but it does not mean he does not deserve a Guidelines sentence given the seriousness of his offense, let alone the two-year slap on the wrist he suggests.

This conviction represents Bowen's third felony conviction. (PSR ¶¶ 36, 38). His first also involved a defaced weapon. (PSR ¶ 36). His second also involved violence, and resulted in a sentence of three years' imprisonment. (PSR ¶ 38). He had been off

20

parole for less than a year on the second offense when the July 1, 2017, shooting occurred. (PSR ¶ 38). This is not the record of a man who is easily deterred from crime.[16] A Guidelines sentence might change that. Moreover, a Guidelines sentence would send a clear message to other convicted felons who are considering picking up a gun that such conduct will not be tolerated.

Bowen's criminal record also demonstrates his disrespect for the law, which was only compounded by his recent perjury in front of the jury and this Court. A man who can get on the stand and lie so openly under oath clearly has no respect for the law. A Guidelines sentence would demonstrate to Bowen the importance of that respect.

### 1.    Bowen's Submission Does Not Alter the Calculus

The remainder of Bowen's arguments do not weigh in favor of a non-Guidelines sentence, and certainly not the two-year sentence that he seeks.

First, Bowen essentially asks the Court for leniency based on his theory of the case, which was rejected by the jury. (Docket Entry 125 at 2–3). Put differently, he asks the Court to assume his innocence when he was in fact found guilty.

---

[16] Bowen tells this Court that he has "zero risk of recidivism" and that, "[p]ut simply, there is no need to protect the public from further crimes of Mr. Bowen, because he has shown that he will never commit another crime." (Docket Entry 125 at 9–10). All evidence in this case stands to the contrary. He had a legitimate job, but a felonious background, when he decided that it made sense to go to a block party, but not before arming himself, and that he should hide evidence of his crime. He has proved wholly willing to engage in criminal activities again when it suits him.

Second, Bowen writes of the importance of his family to him, particularly his three children, two of whom are minors. (Docket Entry 125 at 7–9). Although it is commendable that Bowen has a loving family behind him, he had that at the time he committed the instant offense. Indeed, he testified that he had brought his children to the very block party where he shot another man and was stabbed within an inch of his life earlier in the night. (Tr. 705). His children and apparent status as the sole breadwinner did not stop him from committing crimes just a few years ago. It is not clear that these things would stop him now. He also contradicts himself, asserting that he cannot be apart from his children (Docket Entry 125 at 7), but also saying he would accept a two-year term of imprisonment. (Docket Entry 125 at 2).

Third, Bowen argues that he should be sentenced commensurately with Gaines for this case and Pilgrim for a completely unrelated case. (Docket Entry 125 at 1–2, 10). But Bowen is not "similarly situated" to Gaines and Pilgrim, as he asserts. (Docket Entry 125 at 1). Gaines chose to accept responsibility for his involvement in the July 1, 2017, incident, pleading guilty to the charged felon-in-possession offense on March 27, 2019. Gaines was credited for his acceptance of responsibility and was sentenced by the Court to 32 months' imprisonment. (Docket Entry 68). Here, Bowen has consistently denied responsibility and, as is his right, went to trial. But the different paths taken by Bowen and Gaines means they are not similarly situated. *See United States v. Felder*, 722 F. App'x 61, 63 (2d Cir. 2018) ("Here, [the defendant] was not similarly situated to the co-defendants to whom he compares himself because they pleaded guilty, unlike [the defendant]"). Moreover, this "is simply not the pertinent

comparison, … as [the Second Circuit has] repeatedly made clear that section 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants." *Id.* (internal quotation marks omitted).

Pilgrim was sentenced to 27 months' imprisonment in a case that has nothing to do with this one based on the unique facts of that case and Pilgrim's unique criminal history and personal characteristics. Moreover, Pilgrim pleaded guilty in his case. Any comparison is therefore meaningless.

Fourth, argues that Bowen would be at particular risk if he were contract COVID-19 in prison given his obesity and apparent pre-diabetes. (Docket Entry 125 at 10–11). Notably, Bowen does not say whether he has been vaccinated against COVID-19, which would greatly diminish the risk of severe outcomes even among those with co-morbidities such as obesity. Bowen also does not acknowledge that he runs the risk of contracting COVID-19 simply by being out in the world. COVID-19 is not exclusively a prison problem. Even if it were, as this Court knows, the Bureau of Prisons has made extraordinary efforts to combat COVID-19 within the federal prison system.[17]

---

[17] Information on BOP's COVID-19 vaccination efforts, including a listing by facility that is updated daily, is found here: *https://www.bop.gov/coronavirus/*. The clinical guidance provided to BOP health service professionals is found here: *https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf*. Moreover, in the related compassionate release context, federal courts across the country, including in this District, *see, e.g., United States v. Pabon*, 2021 WL 603269, at *3 (S.D.N.Y. Feb. 16, 2021), have recognized the reduced COVID-19 risk faced by

## IV.    Conclusion

For the reasons set forth above, this Court should sentence Bowen to a sentence

within the applicable Guidelines range of 108 to 120 months' imprisonment. Such a

---

vaccinated inmates—even those with underlying medical conditions that would otherwise indicate increased risk of severe complications from COVID-19 infections—and found no extraordinary and compelling reason to release them. *See, e.g., United States v Jackson*, 2021 WL 1927506, at *3 (N.D. Cal. May 13, 2021); *Gale v. United States*, 2021 WL 1912380, at *3 (E.D. Va. May 12, 2021); *United States v. Giles*, 2021 WL 1737755 (D. Minn. May 3, 2021); *United States v. Roe*, 2021 WL 1711296, at *2 (S.D. Ohio Apr. 30, 2021); *United States v. McBriarty*, 2021 WL 1648479, at *6 (D. Conn. Apr. 27, 2021); *United States v. Johnson*, 2021 WL 1550460, at *5 (D. Minn. Apr. 20, 2021); *United States v. Jameson*, 2021 WL 1405598, at *7 (E.D. Cal. Apr. 14, 2021); *United States v. Vasquez-Uribe*, 2021 WL 1248524, at *2 (D.N.J. Apr. 5, 2021); *United States v. Stiver*, 2021 WL 1110593, at *1 (W.D. Pa. Mar. 23, 2021); *United States v. Gabbard*, 2021 WL 1037724, at *3 (E.D. Mich. Mar. 18, 2021); *United States v. Williams*, 2021 WL 966028, at *3 (W.D.N.C. Mar. 15, 2021); *United States v. Ulmer*, 2021 WL 844579, at *2 (E.D. Pa. Mar. 5, 2021); *United States v. Shepard*, 07-cr-85 (RDM) (D.D.C. March 4, 2021) (ECF 66 at 11-12); *United States v. Cortez*, 2021 WL 689923 (D. Ariz. Feb. 23, 2021); *United States v. McGill*, 2021 WL 662182, at *5 (D. Md. Feb. 19, 2021); *United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021); *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021); *United States v. Ballenger*, 2021 WL 308814, at *5 (W.D. Wash. Jan. 29, 2021); *United States v. Isidaehomen*, 2021 WL 243458, at *3 (N.D Texas January 25, 2021); *United States v. Jones*, 2021 WL 217157, at *5 (E.D. Va. Jan. 21, 2021); *United States v. Piles*, No. CR 19-292-5 (JDB), 2021 WL 1198019, at *3-4 (D.D.C. Mar. 30, 2021) (collecting cases) (internal citation, quotation marks, and editing omitted); *United States v. Oliver*, No. 1:00-CR-157-21 (RCL), 2021 WL 2913627, at *5-6 (D.D.C. July 12, 2021) (same); *United States v. Winston*, No. 1:94-CR-296-11 (RCL), 2021 WL 2592959, at *4 (D.D.C. June 24, 2021) (same); *United States v. Dempsey*, No. 1:19-CR-368 (TNM), 2021 WL 2073350, at *4 (D.D.C. May 24, 2021) (same).

sentence would be sufficient, but not greater than necessary, to accomplish the goals

set forth in 18 U.S.C. § 3553(a).

Dated:        White Plains, New York
              September 20, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York

                        By:             _____
                                        Benjamin A. Gianforti
                                        Michael D. Maimin
                                        Assistant United States Attorneys
                                        (646) 856-5190

25